Trevor MATTIS, Appellant,

v.

Donald T. VAUGHN; the District Attorney of the County of Phila.; the Attorney General of the State of Pa.

No. 01–1285.

United States Court of Appeals,
Third Circuit.

Argued Feb. 25, 2003.

Decided Sept. 5, 2003.

J. Scott O'Keefe (Argued), Philadelphia, PA, for Appellant.

Lynne Abraham, District Attorney, Ronald Eisenberg, Deputy District Attorney, Law Division, Arnold H. Gordon, First Assistant District Attorney, Thomas W. Dolgenos, Chief, Federal Litigation, Robert M. Falin, (Argued), Assistant District Attorney, Office of District Attorney, Philadelphia, PA, for the Appellees.

Before: BECKER, Chief Judge,*
SCIRICA, Circuit Judge,** and
SHADUR, District Judge.***

---

* Judge Becker's term as Chief Judge ended on May 4, 2003.

** Judge Scirica became Chief Judge on May 4, 2003.

*** Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Trevor Mattis appeals from an order of the United States District Court for the Eastern District of Pennsylvania dismissing his petition for a writ of habeas corpus on the ground that his claim for relief under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was procedurally defaulted. Mattis contends that his case represents a fundamental miscarriage of justice, and, as such, the procedural default of his claim should be excused. We conclude that Mattis has not shown a fundamental miscarriage of justice sufficient to overcome the procedural default of his claim for habeas relief. Therefore, we will affirm the District Court's order.

## I. PROCEDURAL HISTORY

Following a bench trial in Philadelphia County, Pennsylvania, Mattis was convicted in 1990 of first degree murder, criminal conspiracy, possession of an instrument of crime, and a violation of the Uniform Firearms Act, in connection with the shooting death of Mead Johnson. In post-trial motion proceedings, Mattis raised the issue of newly-discovered evidence that a trial eyewitness, Franklin Watson, gave a prior inconsistent statement to federal authorities that exculpated Mattis. The trial court denied the motions, and Mattis was sentenced to an aggregate term of life imprisonment. Mattis appealed to the Pennsylvania Superior Court, which affirmed the conviction. Mattis did not seek allowance of appeal to the Pennsylvania Supreme Court.

In December 1996, Mattis filed a Pennsylvania Post–Conviction Relief Act ("PCRA") petition, claiming that Watson's statements to federal officials before Mattis's trial comprise *Brady* material, and that prior counsel had rendered ineffective assistance in failing to urge reversal in post-trial motions on this basis. The PCRA Court denied the petition on the ground that the claims were previously litigated on direct appeal. The Pennsylvania Superior Court affirmed, and the Pennsylvania Supreme Court denied review in 1999.

On December 22, 1999, Mattis filed a habeas petition under 28 U.S.C. § 2254, seeking to raise his *Brady* claim. In supplemental memoranda, Mattis contended that his claims were not procedurally defaulted for failure to petition the Supreme Court on direct appeal in light of Pennsylvania Supreme Court Order 218, issued May 9, 2000, ("Order 218"), which provides that a prisoner need not petition for discretionary review to meet the exhaustion of state remedies requirement.

The Magistrate Judge concluded that Order 218 must be applied retroactively to Mattis's pending habeas case, and therefore the *Brady* claim was exhausted. The Magistrate Judge proceeded to recommend that Mattis's habeas petition be granted on that claim. The parties filed objections to the Magistrate Judge's report and recommendation. The District Court, however, determined that the *Brady* claim was procedurally defaulted, and, upon review of the merits of the claim to determine whether there was a fundamental miscarriage of justice to excuse the procedural default, concluded that there was no miscarriage of justice because there was no factual basis for the *Brady* claim.[1]

---

1. We note that Mattis had also raised claims of ineffective assistance of counsel in his habeas petition. In his determination of those claims, the Magistrate Judge agreed with the state courts that the *Brady* claim had been raised on direct appeal, and thus, the claims

Mattis timely appealed *pro se* and filed a request for a certificate of appealability under 28 U.S.C. § 2253(c)(1), in which he alleged his innocence and a fundamental miscarriage of justice regarding his *Brady* claim. On May 3, 2002, a motions panel of this Court granted the certificate on the *Brady* claim that, before Mattis's trial, Assistant United States Attorney ("AUSA") Thomas Suddath orally conveyed to the state prosecutor's office evidence favorable to the defense; that the prosecution did not disclose this evidence to the defense; and that the evidence was material. In addition, the panel granted the certificate on the question whether Mattis demonstrated a fundamental miscarriage of justice to overcome the procedural default of the claim, noting that under *Wenger v. Frank*, 266 F.3d 218, 225–26 (3d Cir.2001), Order 218 does not apply retroactively to cases in which the time to petition for discretionary review expired before Order 218 was issued.[2] Counsel was appointed to represent Mattis on appeal.

Because this is an appeal from a final order dismissing Mattis's habeas petition, we have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's determination that the *Brady* claim is procedurally defaulted and that no miscarriage of justice was shown. *Hull v. Kyler*, 190 F.3d 88, 97 (3d Cir.1999).

## II.  THE *BRADY* CLAIM

The factual background of the *Brady* claim is well-known to the parties, although their presentations of the facts differ. The following basic facts can be gleaned from the record. At Mattis's trial, Franklin Watson and Paul White were the chief witnesses for the prosecution. Though their accounts of the events differed in some respects, both testified that Mattis (a/k/a "Two Strand") and the victim, Mead ("Meadie") Johnson, were arguing at a drug house on the night of the murder, and that Mattis shot Johnson outside on the street after a struggle, with "Mikey," a/k/a "Donovan," at the scene. Mattis testified in his own defense that Donovan was the shooter.

In connection with a drug sales operation implicating both Mattis and Watson, Watson was interviewed by federal agents a few weeks before Mattis's trial. AUSA Suddath conducted the interview, during which Watson described the events leading to the shooting and the shooting itself. Handwritten, non-verbatim notes of the interview were compiled and prepared into a handwritten form DEA–6. The handwritten DEA–6 was then placed into a typing pool and was ultimately reduced to typewritten form a few months later, after Mattis's trial. Paragraphs 25 and 26 of the DEA–6 deal with Watson's account of the events leading to the shooting, and in paragraph 27, Watson identified Donovan as the one who had scuffled with and shot Meadie, while Mattis (a/k/a "Two Strand," identified as "Too Strong" in the DEA–6) stood nearby during the scuffle.

At no time did the federal authorities release the DEA–6 to the District Attorney's Office that prosecuted Mattis's case. However, during a hearing on Mattis's post-trial claims, AUSA Suddath testified

---

premised on counsel's failure to raise the *Brady* claim on direct appeal were without merit. The District Court, having found no objections to the Magistrate Judge's report concerning those claims, denied those claims for relief. These claims are not presently before us.

**2.** We note that neither the Magistrate Judge nor the District Court had the benefit of our decision in *Wenger*, as *Wenger* post-dates the District Court's disposition of Mattis's case by several months.

that he had spoken on the telephone with an Assistant District Attorney a few days before the trial regarding the content of his notes from the Watson interview, which he believed were compatible with the information contained in the form DEA–6. The certificate of appealability issued in this case concerns the information conveyed during AUSA Suddath's telephone call to an Assistant District Attorney before Mattis's trial.

## III. DISCUSSION

Under *Brady v. Maryland,* due process entitles a criminal defendant to evidence possessed by the prosecution if it is favorable and material to the defendant's guilt or punishment. *Brady,* 373 U.S. at 87. Evidence is in the possession of the prosecution if it is known to any person acting on the prosecution's behalf in the case, even if the specific prosecutors involved are unaware of the evidence. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence is "material" if there is a reasonable probability–that is, a probability sufficient to undermine confidence in the trial's outcome–that its pretrial disclosure would have produced a different result at trial. *United States v.*

*Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ As determined by the District Court, the underlying *Brady* claim in Mattis's habeas petition was procedurally defaulted; he did not present the claim to the Pennsylvania Supreme Court on direct appeal, and he no longer has a state remedy available.[3] To excuse the default, Mattis alleges his innocence of the crime and asserts that a miscarriage of justice has occurred. To meet the miscarriage of justice standard, Mattis must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). To establish actual innocence, Mattis must show that in light of new evidence, no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup v. Delo,* 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Mattis contends that the facts of the *Brady* claim comprise the new evidence upon which his actual innocence claim is based. Thus, we review these facts accordingly.[4]

Mattis contends that AUSA Suddath conveyed exculpatory information to the District Attorney's office during the pretrial telephone call–namely, the identifica-

---

**3.** As noted earlier, Pennsylvania Supreme Court Order 218 does not apply to Mattis and does not excuse his failure to present his claim on discretionary review before the Pennsylvania Supreme Court. *Wenger v. Frank,* 266 F.3d 218, 225–26 (3d Cir.2001).

**4.** The Commonwealth reminds us of the standards contained in section 2254 regarding the review of habeas claims. Under 28 U.S.C. § 2254(d), relief on Mattis's habeas claim could not be granted unless the state court decisions rejecting his claim on the merits were contrary to, or unreasonable applications of, clearly established federal law, or an unreasonable determination of the facts. However, based on our review of the record, neither the state trial court's opinion nor the

Superior Court's opinions on Mattis's ineffective assistance and prosecutorial misconduct claims (under which Mattis first raised his *Brady* claim) clearly resolve whether the prosecution was in possession of orally communicated exculpatory evidence before Mattis's trial. Both opinions rely on the fact that Watson's statement was not available in written form until after the trial. We therefore disagree with the Commonwealth and conclude that the state courts did not make a factual finding on whether the prosecution had in its possession orally communicated exculpatory evidence before Mattis's trial, and hence, the presumption of correctness under 28 U.S.C. § 2254(e)(1) does not apply here.

tion of Donovan as the shooter–and that the information was material. In support of this claim, Mattis points to AUSA Suddath's testimony at the post-sentencing hearing regarding his pre-trial telephone call to one of the Assistant District Attorneys. Suddath recalled "piecing together" his notes from the interview of Watson during the call; because he believed his notes were consistent with the later-typed DEA–6, he believed the DEA–6 was generally consistent with what he relayed over the telephone. As paragraph 27 of the DEA–6 reflects that Watson identified Donovan, not Mattis, as the shooter, Mattis contends that Suddath therefore conveyed exculpatory information to the prosecution that was not disclosed to the defense. Mattis asserts that this *Brady* information was material because Watson's statement contained in the DEA–6 corroborated Mattis's testimony regarding the events preceding and including the shooting, and it highlighted the inconsistencies in Watson's and White's eyewitness testimonies at trial.

The Commonwealth flatly denies that Suddath conveyed any *Brady* information during the telephone call.[5] The Commonwealth points to other portions of Suddath's testimony at the post-sentencing hearing, reflecting Suddath's awareness of Mattis's upcoming trial date and his knowledge that Watson would be a witness for the prosecution, to refute the suggestion that the telephone call was made to alert the Commonwealth to a different suspect in the shooting. For example, the Commonwealth notes that the trial judge asked Suddath, ". . . did that Assistant District Attorney obtain the information substantively contained in 26 and 27, if you can tell me?" and that Suddath replied, "Your Honor, to the best of my recollection, the information which I provided to the Assistant District Attorney generally followed the form set forth in paragraphs – the information contained in paragraphs 25 and 26. It was not as detailed as that." What Mattis characterizes as Suddath's mistake in identifying paragraphs 25 and 26 as information conveyed during the telephone call (rather than paragraph 27, in which Watson identified Donovan as the shooter), the Commonwealth characterizes as a deliberate distinction.

In addition, the Commonwealth relies on the fact that Suddath later affirmed the Commonwealth's summary of his testimony, that "there's a witness who says he saw the murder and he says that Two Strand [Mattis] did it, and he has an indictment pending and is coming up to deal with that matter . . . ." However, Mattis contends that Suddath's mere agreement with the Commonwealth's recapitulation of Suddath's direct testimony must have been in error, as it was inconsistent with his earlier testimony regarding the contents of the DEA–6, namely, of paragraph 27's identification of Donovan as the shooter, and Suddath's testimony clarifying for the record that "Donovan" is not the same person as "Two Strand" or Mattis.

---

5. As stated earlier, during a hearing on Mattis's post-trial claims, AUSA Suddath testified that he spoke on the telephone with an Assistant District Attorney a few days before Mattis's trial regarding the interview with Watson. Suddath testified that he did not have a specific recollection that the Assistant District Attorney with whom he spoke was Richard Sax, who prosecuted the case, although Suddath stated that he believed that it "very well could have been" Sax. Sax testified that he learned of the existence of Watson from a Philadelphia police homicide detective, and that neither he nor any other member of the District Attorney's Office had any contact with anyone from the United States Attorney's Office concerning Mattis's case. At the hearing, the trial judge credited *both* attorneys' testimonies as being truthful.

The parties disagree in their interpretations of the record, and indeed, the Magistrate Judge and the District Judge in this case reached opposite conclusions regarding whether a factual basis exists for Mattis's *Brady* claim. The underlying facts of Mattis's *Brady* claim are troubling. However, we do not resolve this case on that ground. As noted earlier, our review is within the context of whether Mattis meets the miscarriage of justice exception to excuse the procedural default of this claim. Although Mattis's brief does not squarely address this issue, he contended at oral argument that the new evidence–Watson's identification in the DEA–6 of Donovan as the shooter–establishes his actual innocence of the murder. He also contends that the miscarriage of justice is evident in the *Brady* claim itself. Specifically, he argues that Watson's undisclosed statement would have bolstered the defense because it corroborated his account of the incident, and it would have weakened the prosecution's case because Paul White's inculpatory trial testimony differed significantly from Watson's.

■ White's trial testimony included his eyewitness account that Mattis shot Johnson following an argument between the two men. His testimony was extensive, but in basic terms, White stated that Mattis and Johnson had had an argument, that Mattis had a handgun, that Johnson went outside to retrieve clothing from his vehicle, and that Johnson had opened the trunk of the vehicle when Mattis and Donovan approached him. White further stated that Mattis and Johnson were in a struggle near the vehicle when Mattis shot Johnson. Upon consideration of Watson's testimony regarding the shooting, some inconsistencies appear in the details, but, as the Superior Court noted on direct appeal, White and Watson agreed on the essential facts that Mattis and Johnson had a quarrel, the fatal shots were fired in the vicinity of the vehicle, and Mattis was the shooter. On this record, we cannot conclude that the impeachment of Watson's trial testimony with his identification of a different triggerman in the DEA–6 would satisfy the *Schlup* standard that no reasonable juror would have found Mattis guilty beyond a reasonable doubt. Indeed, in his opinion following the denial of post-sentence motions, the trial judge–the fact finder in Mattis's bench trial–concluded that, even if Watson's statement had been available, the outcome of the trial would have been the same. Moreover, Mattis has not established that no reasonable fact finder would have convicted him based on White's testimony alone. At most, Mattis has shown that it is possible that a reasonable juror could have acquitted him in light of the new evidence. The *Schlup* standard for proving actual innocence is far more demanding than establishing the existence of a reasonable doubt. *See Schlup*, 513 U.S. at 329.

## IV. CONCLUSION

We conclude that Mattis has failed to show that a fundamental miscarriage of justice will occur if the procedural default of his *Brady* claim is not excused in his case. Therefore, we will affirm the order of the District Court.